165 Cal.App.4th 1546 (2008)
In re AARON D. et al., Persons Coming Under the Juvenile Court Law.
SAN BERNARDINO COUNTY DEPARTMENT OF CHILDREN'S SERVICES, Plaintiff and Respondent,
v.
RUBY D., Defendant and Appellant.
No. E044453.
Court of Appeals of California, Fourth District, Division Two.
August 19, 2008.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*1551 Lelah S. Forrey-Baker, under appointment by the Court of Appeal, for Defendant and Appellant.
Ruth E. Stringer, Acting County Counsel, and Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.
Michael D. Randall, under appointment by the Court of Appeal, for Minors.

OPINION
RAMIREZ, P. J.
Appellant Ruby D. (Mother) is the mother of two children, Aaron D., born in 2004, and Arriana D., born in 2003 (children). Mother appeals from the juvenile court orders terminating her parental rights to the children. Specifically, Mother argues (1) the juvenile court lacked jurisdiction over this case under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) (Fam. Code, § 3400 et seq.) because Texas had jurisdiction over custody determinations involving the children and the California juvenile court did not contact the Texas court to resolve jurisdiction; (2) Mother did not receive proper notice of the Welfare and Institutions Code section 366.26[1] selection and implementation hearing; and (3) the court erred in finding the children adoptable because of their special developmental needs, physical ailments, and psychosocial issues.
As discussed below, we conclude that the juvenile court lacked anything other than emergency jurisdiction over this case under the UCCJEA because the court in Texas had already made a custody order regarding Arriana and a custody proceeding was pending regarding Aaron. We further hold that, because the court's emergency jurisdiction under Family Code section 3424 was of limited duration, the court was required to have contacted the Texas court as soon as possible after learning about the Texas custody proceedings, but in any case prior to entering the jurisdiction order. Mother's remaining contentions are rejected. The jurisdiction order is affirmed with directions. The juvenile court is directed to communicate with the 317th Judicial District Court of Jefferson County, Texas, in accordance with the UCCJEA. All orders beginning with the jurisdiction order are affirmed on the condition that the Texas court declines jurisdiction in favor of California. In the event that the Texas court chooses to retain jurisdiction, the jurisdiction order and all subsequent orders are reversed.

*1552 I.

FACTS AND PROCEDURE

A. Texas CPS History

Mother, then age 20, her then husband (Stepfather), and the children moved to California from Texas in December 2005 in the aftermath of Hurricane Rita. Even prior to the hurricane, Mother had had a difficult time maintaining a stable residence, and the Texas Department of Family and Protective Services (Texas CPS) was already involved with the family. Mother had several prior child protection referrals in Texas for physical abuse, medical neglect, and neglectful supervision. Texas CPS was investigating allegations of substance abuse and neglect as to Mother when she moved to California.

B. Detention in California

The children came to the attention of the San Bernardino County Department of Children's Services (DCS) on January 15, 2006, when then 13-month-old Aaron was seen at Barstow hospital for an infection around his eyes and was found to have multiple suspicious bruises about his head, face, stomach, and back. Mother and Stepfather had no explanation for how some of the injuries occurred and had inconsistent explanations as to other injuries.
Mother and Stepfather were married in November 2005, and Stepfather was not the father of either child. Stepfather was incarcerated for assaulting Mother in January 2006. The father of the children (Father) resided in Texas and was reported as being violently abusive toward Mother and the children. He had been arrested numerous times in Texas for being physically abusive to Mother and the children, and was convicted of assault with bodily injury in October 2004, when he attacked Mother while she was pregnant. He also had a history of substance abuse.
On January 15, 2006, DCS took the children into protective custody and filed section 300 petitions on their behalf pursuant to section 300, subdivisions (a) and (b). At the detention hearing, the children were formally removed from the parents and placed in a foster home.
The social worker reviewed Mother's case plan with her. Mother was referred to a domestic violence program in Barstow, and arrangements were made for housing at a shelter. However, Mother clearly stated that she *1553 planned to return to Texas. She was then advised that if she obtained housing in Texas she would receive referrals in that area so she could complete her service plan. She was also advised that reunification with her children, though not impossible, would be difficult, as the children would remain in California unless relatives in Texas were approved. In addition, her visitation with the children would be limited if she chose to move to Texas.

C. Jurisdictional Finding and Disposition

In the jurisdiction/disposition report filed with the juvenile court on February 6, 2006, the social worker reported that "Mother stated that the father of the children ... resided in Beaumont, Texas. [The father] initially denied paternity of Aaron, but paternity testing was done and confirmed he was father of both children. Mother stated that she and father are going through family law court in Texas to determine custody."
On March 2, 2006, the juvenile court found the allegations in the petitions true as amended; the children were declared dependents of the court and maintained in their foster home. Mother and Father were granted reunification services and ordered to participate in their case plans.

D. Six-month Review Hearing and Report

In a status review report filed August 30, 2006, the social worker recommended that the children remain in out-of-home care and that the parents be provided with additional reunification services. Mother had moved from California to Beaumont, Texas, and had been participating in her case plan. She was renting a home, had entered into a "common law marriage," and was employed. Mother was also pregnant with her third child and due in September 2006.[2]
Meanwhile, the children were doing well emotionally and physically in their foster home. They played well together, and Aaron was making progress in his developmental delays. The children's current caretaker was willing to adopt the children, and the children had a bond with her.
Mother had weekly telephone calls with Arriana, but Mother reported that the child just screamed and cried during the calls. The foster mother, however, noted that Arriana sang songs with Mother and told Mother that she *1554 loved her. Aaron was not able to speak due to his young age, but occasionally the foster parent put Aaron on the telephone so he could hear Mother's voice.
Mother appeared telephonically at the August 30, 2006, six-month review hearing. Father was present. The children were continued as dependents of the court and maintained in their confidential placement. The parents were granted additional reunification services. The parties and the court discussed whether to begin the ICPC[3] process to investigate whether the children could be placed with relatives in Texas. Counsel for DCS then made the court aware of the UCCJEA process as an alternative to ICPC. Counsel stated that she would file a special motion to arrange for the court to speak to the Texas court by telephone about whether to transfer the matter to the Texas court. For this reason, the court set an appearance review for October 18. The court also continued the matter to February 21, 2007, for a 12-month review hearing.

E. Appearance Reviews and Evaluation of Mother's Texas Home

On October 18, 2006, Mother was present in court for an appearance review. No telephone conference with the Texas court had been scheduled or was held. A different attorney appeared on behalf of DCS and was "under the impression that it was the Court that was going to contact Texas." Mother's counsel opined "I would be really surprised if Texas said that they would take the case." The discussion shifted to completing the ICPC process on the parents and grandparents in Texas. The court ordered the social worker to travel to Texas to evaluate the parents, grandparents and their homes and to provide a report to the court prior to the next hearing. The court authorized the social worker to place the children with Mother or the grandparents if they and their homes were suitable. A further appearance review was scheduled for December 13, 2006.
At the December 13, 2006, appearance review, at which Mother was present, the juvenile court reviewed the report of that date and, in accordance with DCS's recommendation, ordered the children to remain in their current out-of-home placement rather than being moved to Texas. The court further confirmed February 21, 2007, as the date for the 12-month review hearing.
In the report filed on December 13, 2006, the social worker reported that he went to Texas in November 2006 and met with Mother's parenting class instructor and her domestic violence counselor. The parenting instructor *1555 reported that Mother took a very active role in the class and opined Mother might be able to care for the children with assistance of the STAR (Services to At-Risk Youth) program, which sent workers to the home at least once a week. Mother's domestic violence counselor reported that Mother had benefited from her domestic violence program, could do well with support through the STAR program, but should remain in counseling and the domestic violence program if the children were returned to her.
The social worker also met with Mother at her two-bedroom home in Texas. This home belonged to Ms. N., the mother of her common law husband, and Mother lived in the home rent free. The home was very clean and amply supplied with food, diapers, and formula for Mother's newborn son. Mother paid utilities from her job earnings and received food stamps and free day care. However, on December 11, 2006, Ms. N. informed the social worker that she had kicked Mother out of the home and took her car away from Mother for lying, spending time with numerous men, and not caring for her baby. Hence, by December, Mother did not have a stable residence. After speaking with Ms. N., the social worker had grave concerns about Mother's ability to adequately parent her children; Mother continued to become involved in relationships with manipulative and controlling people, including Ms. N.

F. 12-month Status Review Hearing and Reports

The status review hearing set for February 21, 2007, was continued to April 23, and then to May 3, 2007, to allow the parents to be present. The social worker's recommendation was to terminate services and set a section 366.26 selection and implementation hearing.
In the status review report filed February 21, 2007, the social worker reported that he met with Mother after the December 13, 2006, status review hearing, and that Mother confirmed that she had to find another place to reside and did not know how she was going to get another residence. She was adamant about residing in Texas despite the social worker urging her to return to California to complete her reunification services within the statutory time frame.
On January 22, 2007, Texas CPS had informed the social worker that it was investigating Mother after she was involved in a car accident in which her newborn son was seriously injured and the hospital staff had contacted their department with concerns about Mother's behavior. The Texas CPS social worker reported that Mother's 18-year-old boyfriend, who had a *1556 suspended license, was driving the vehicle when he fell asleep at the wheel. Mother's newborn son was removed from her care by Texas CPS.
In addition, as of February 7, 2007, Mother had not completed her domestic violence program; she had stopped attending the program in December. She also failed to even begin her general counseling requirement. The social worker had sent Mother a certified letter informing her that she needed to attend counseling, but the letter was returned as undeliverable. Mother completed her parenting education program, but the social worker had doubts as to whether she had benefited from the program. When the social worker spoke again with Mother's domestic violence counselor, who was also Mother's homeless shelter liaison, the counselor no longer believed that Mother benefited from her parenting classes. This belief arose from the counselor observing Mother at the homeless shelter in which she wrote Mother up for not taking responsibility for her baby, after speaking with Mother many times about her actions.
In addendum reports filed March 22, April 11, and April 16, 2007, the social worker again recommended terminating reunification services and setting a section 366.26 hearing. Texas CPS had taken custody of Mother's baby, who had sustained a skull fracture and numerous bruises on the brain in the January car accident, and the authorities indicated their intention to fast track that case to adoption. The incident report of the car accident indicated that the baby's car seat was not fastened into the vehicle; the baby in the car seat was being passed around in the car from adult to adult. Mother was expelled from her homeless shelter after she left for two days and was seen flirting with male workers. The social worker noted that, during the course of the six-month reporting period, Mother had not worked on her service plan and had failed to benefit from the programs that she had completed or attended.
Meanwhile, the children were well cared for in their foster home, and their caretaker was willing to adopt them. Mother had visited the children on December 13, 2006, after the last court hearing. Arriana smiled and hugged Mother. Aaron appeared to be afraid of Mother and cried, apparently because he was unfamiliar with her.
The contested 12-month review hearing was held on May 3, 2007. The social worker's reports were admitted into evidence. Following testimony from Mother, Father, and the social worker and argument of counsel, the juvenile court ordered that reunification services for the parents be terminated *1557 and that the matter be set for a section 366.26 selection and implementation hearing. The parents were informed of their appellate writ rights, and on the same day, Mother filed a notice of intent to file a writ petition pursuant to California Rules of Court, rule 8.450. This court denied the petition on July 31, 2007.

G. Section 366.26 Hearing and Reports

In preparation for the section 366.26 hearing scheduled for August 31, 2007, DCS filed a report in which it recommended terminating Mother's parental rights and selecting a permanent plan of adoption for the children. DCS also submitted an adoption assessment dated July 24, 2007. The adoption social worker concluded that both children were adoptable, were comfortable in their current foster placement/prospective adoptive home, and had developed an attachment to the prospective adoptive family. The social worker noted that two-year-old Aaron was in need of services from the Inland Regional Center to address speech delays and lack of social skills that resulted in difficulties getting along with other children. The social worker also noted that three-year-old Arriana suffered from anemia and had deformities in her ankles and feet that needed to be addressed. The social worker reported the foster mother's comments that Arriana was very shy around other children and that previous incidents of head butting and tantrums had decreased since she had been in the foster home.
Mother did not appear for the section 366.26 hearing scheduled for August 31, 2007. At the request of Mother's attorney, the juvenile court continued the hearing to September 18, 2007. The court did not give Mother new notice of the continued hearing.
Mother did not appear for the September 18, 2007, hearing. Mother's counsel asked that the hearing be rescheduled because it was difficult to get phone messages to Mother where she was residing. The juvenile court denied this request and proceeded with the hearing. The court terminated Mother's parental rights to the children and selected adoption as the permanent plan for both children, with preference to the current foster mother. This appeal followed.

II.

DISCUSSION

A. Jurisdiction Under the UCCJEA

Mother argues that the jurisdiction and disposition orders in this case must be reversed and all subsequent orders vacated because under the UCCJEA, *1558 Texas, not California, had jurisdiction over custody determinations regarding the children. Further, Mother asserts that, even if California had emergency jurisdiction over the children because they were subjected to or threatened with mistreatment or abuse under Family Code section 3424, the jurisdiction was temporary and did not permit the juvenile court to enter jurisdiction and disposition orders.

1. Mother Could Not Waive Subject Matter Jurisdiction

(1) "The Act is the exclusive method of determining the proper forum in custody disputes involving other jurisdictions and governs juvenile dependency proceedings. [Citations.]" (In re C. T. (2002) 100 Cal.App.4th 101, 106 [121 Cal.Rptr.2d 897] (C.T.).) (2) At issue here is a question of subject matter jurisdiction, which either exists or does not exist at the time the action is commenced. (Adoption of Zachariah K. (1992) 6 Cal.App.4th 1025, 1035 [8 Cal.Rptr.2d 423].) Subject matter jurisdiction, including a child custody matter, "cannot be conferred upon a court by consent, waiver or estoppel." (In re Marriage of Ben-Yehoshua (1979) 91 Cal.App.3d 259, 263 [154 Cal.Rptr. 80]; see also 2 Witkin, Cal. Procedure (4th ed. 1996) Jurisdiction, § 12, pp. 556-558 ["The very nature of subject matter jurisdiction, as a required element distinct from that of jurisdiction of the parties, indicates that it cannot be conferred by consent, waiver or estoppel."].)
(3) We recognize that section 395 normally bars the parties from challenging the jurisdiction and disposition orders during the appeal from a later order.[4] However, this is a rule of waiver, which cannot be used to confer subject matter jurisdiction. Mother does not ask us to review the merits of these orders, but rather the juvenile court's power to issue them in the first place. Moreover, even the case law implementing section 395 allows relaxation of the waiver rule where (1) "there [is] some defect that fundamentally undermined the statutory scheme ..." and (2) the "defects ... go beyond mere errors that might have been held reversible had they been properly and timely reviewed." (In re Janee J. (1999) 74 Cal.App.4th 198, 208-209 *1559 [87 Cal.Rptr.2d 634].) Thus, we consider the issue despite Mother's failure to raise it below.

2. Texas Jurisdiction

(4) Under the UCCJEA, the court attempts to determine the child's "home state" prior to making custody orders, and a California court may exercise jurisdiction if, on the date of the commencement of the proceeding, it was the "home state" of the child. (Fam. Code, § 3421, subd. (a)(1).) The "home state" is "`the state in which the child immediately preceding the time involved lived with the child's parents, a parent, or a person acting as parent, for at least six consecutive months...." (Haywood v. Superior Court (2000) 77 Cal.App.4th 949, 954-955 [92 Cal.Rptr.2d 182], quoting Fam. Code, § 3402, subd. (e).) Here, the home state of the children is Texas, not California, because they were born in Texas, arrived in California on December 10, 2005, and were detained by DCS on January 15, 2006, little more than one month later.
If a court of another state has exercised jurisdiction over child custody or visitation, either via a child custody determination or the commencement of a child custody proceeding, a California court may not exercise jurisdiction, unless or until the foreign court has determined that California is a more appropriate forum. (Fam. Code, §§ 3424, subd. (b),[5] 3421, subd. (a)(3).) Family Code section 3402, subdivision (c), defines a "`[c]hild custody determination'" to mean a court "providing for the legal custody, physical custody, or visitation with respect to a child."[6] Family Code section 3402, subdivision (d) defines "`[c]hild custody proceeding'" as "a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue."[7] In addition, "[c]ommencement" of a proceeding "means the filing *1560 of the first pleading." (Fam. Code, § 3402, subd. (e).) Thus, we review the prior proceedings and determinations regarding the children in the Texas courts to determine whether any of them concerned the legal or physical custody of the children, or visitation with them.
Here, there is no doubt that the State of Texas exercised jurisdiction over Arriana, in the form of an "Order Establishing the Parent-Child Relationship" between Father and Arriana, filed April 22, 2004, in the 317th Judicial District Court of Jefferson County, Texas, in case No. C189678. The order appointed Mother and Father "Joint Managing Conservators" of Arriana, with Mother as the primary conservator having "the exclusive right to designate the primary residence of the child" and ordered Father to pay child support. Under Family Code sections 3402 and 3424, this established jurisdiction over Arriana's custody with the State of Texas because the order concerned Arriana's physical and legal custody.
(5) Whether Texas exercised jurisdiction over Aaron is not as clear cut. On September 16, 2005, the 317th Judicial District Court of Jefferson County, Texas, issued a temporary (20-day), ex parte protective order prohibiting Father from contacting or harassing Mother. Mother argues that this order qualifies as a child custody termination or proceeding under Family Code section 3402, subdivisions (c) and (d), and so gave Texas jurisdiction over all custody determinations involving Aaron and Arriana. We disagree. As set forth above, Family Code section 3402, subdivision (c), defines a "`[c]hild custody determination'" to include temporary orders "providing for the legal custody, physical custody, or visitation with respect to a child." Subdivision (d) further defines "[c]hild custody proceeding" to include proceedings for "protection from domestic violence, in which the issue may appear." This qualification specifying that "the issue" must appear in the proceeding refers to the issue of "legal custody, physical custody, or visitation with respect to a child." (Fam. Code, § 3402, subd. (c).) We have reviewed the temporary protective order and find that it does not deal directly with any issues of visitation or custody. The order prohibits Father from doing four things: (1) committing acts of violence against members of Mother's family or household; (2) communicating with Mother in a threatening or harassing manner; (3) going within 100 yards of Mother's home or job; and (4) engaging in harassing or abusive, etc., conduct toward Mother and her family household. While the form application for the protective order did ask the court to "render orders providing for the possession of and access to the child(ren)" (i.e., custody and visitation) after notice and a hearing, there is no indication in the *1561 record that a hearing was ever held or any orders addressing custody and visitation were ever entered or contemplated.[8] For this reason, we are doubtful that the harassment proceeding qualifies as a child custody proceeding under Family Code section 3402, subdivision (d).
However, the record lends some credence to Mother's claim that a Texas child custody proceeding was commenced regarding Aaron, in the form of a "Petition to Establish the Parent-Child Relationship, Suit for Modification and Motion to Confirm Support Arrearage." Like the court order establishing the parent-child relationship between Arriana and Father, this petition also carries the case No. C189678. The petition also sets forth a proposed visitation and custody schedule. However, as DCS points out, the copy of this petition included in the record is not dated and contains no indication it was ever filed. "`Commencement' means the filing of the first pleading in a proceeding." (Fam. Code, § 3402, subd. (e).) This means that, without proof that the petition was filed, Mother cannot establish that a child custody proceeding was begun in Texas courts.
Along with her reply brief, Mother filed a request for judicial notice, which this court granted, of an "Order for Parentage Testing" to establish whether Father is Aaron's father. The "Order" is signed by a judge and dated November 3, 2005. The case number is the same as that for the proceeding regarding Arriana, so it appears that Aaron was added onto Mother's existing case with Father. The order also sets a "hearing on the merits of the parentage action or temporary orders, if appropriate." Finally, the record contains a copy of the "DNA Parentage Analysis," dated December 1, 2005, and with a collection date of November 16, 2005, which establishes Father as Aaron's parent. We recognize that a parentage and support action is not necessarily an action for child custody or visitation. We also recognize that Mother has not provided a signed and filed copy of either a petition or an order regarding custody or visitation. Nevertheless, we are satisfied that this record provides enough information from which we can reasonably conclude that a child custody proceeding regarding Aaron was ongoing in Texas at the time he was detained by the California juvenile court.

3. Did California's Emergency Jurisdiction Ripen into Permanent Jurisdiction?

(6) A court that otherwise lacks subject matter jurisdiction to make or modify a child custody determination can make a temporary emergency order "if the child is present in this state and ... it is necessary in an emergency to *1562 protect the child because the child ... is subjected to, or threatened with, mistreatment or abuse." (Fam. Code, § 3424, subd. (a).) There is no doubt that the California juvenile court was authorized to make a temporary emergency order to protect the children because of the injuries Aaron had suffered that were documented during his emergency room visit. However, if an out-of-state custody order is in effect or an out-of-state custody proceeding is pending, as is the case here, then the California juvenile court may exercise its emergency jurisdiction only to issue a temporary custody order for a limited period of time.[9] "Assumption of emergency jurisdiction does not confer upon the state exercising emergency jurisdiction the authority to make a permanent custody disposition. [Citation.]" (C.T., supra, 100 Cal.App.4th at p. 108.)
(7) The question then is whether the juvenile court's emergency jurisdiction ripened into permanent jurisdiction allowing it to make the jurisdiction, disposition, and subsequent orders. The UCCJEA provides that California's emergency jurisdiction, in cases where another state already has made a custody determination or has a custody proceeding pending, can ripen into permanent jurisdiction if the California court can acquire jurisdiction to modify another state's custody order. Family Code section 3423 provides that this can happen only if (1) a California court has jurisdiction to make an initial determination under Family Code section 3421, subdivision (a)(1) [home state] or (2); and (2) the Texas court determines either that it no longer has exclusive, continuing jurisdiction under Family Code section 3422 [extent of exclusive and continuing jurisdiction], or that California would be a more convenient forum under Family Code section 3427, or the children and their parents do not reside in Texas. Family Code section 3421, subdivision (a)(2), states: "Except as otherwise provided in [s]ection 3424 [temporary emergency jurisdiction], a court of this state has jurisdiction to make an initial child custody determination only if any of the following are true: ... [¶] (2) ... a court of the home state of the child has declined to exercise jurisdiction on the grounds that this state is the more appropriate forum under [s]ection 3427 [inconvenient forum] or 3428 [declining to exercise jurisdiction due to unjustifiable conduct], and both of the following are true: [¶] (A) The child and the child's parents, or the child and at least one parent or a *1563 person acting as a parent, have a significant connection with this state other than mere physical presence. [¶] (B) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships."
Here, there is nothing in the record to indicate that a Texas court ever declined jurisdiction or determined that California would be a more convenient forum under Family Code section 3421, subdivision (a)(2). DCS argues that Texas declined jurisdiction because Texas CPS did not file a dependency petition in Texas despite numerous referrals, and in fact closed an open referral once it found out that DCS had filed its petition in California juvenile court. However no Texas court ever declined jurisdiction, possibly because the California juvenile court did not communicate with the Texas court as required by Family Code section 3424, subdivision (d). Thus, California's temporary jurisdiction over this case never ripened into permanent jurisdiction or jurisdiction to modify Texas's child custody orders under Family Code section 3424.

4. Emergency Jurisdiction Ends Before Jurisdictional Finding

(8) The question then ariseswhen does a juvenile court's emergency jurisdiction end, i.e., at what point in the process should the California juvenile court have contacted the Texas court? Our colleagues in the Fourth Appellate District, Division One, answered this question in C.T., supra, 100 Cal.App.4th 101. The California juvenile court should have contacted the Texas court "immediately" or "as soon as possible" after learning of the Texas child custody proceedings, rather than waiting until after the section 300 jurisdictional hearing. (100 Cal.App.4th at p. 110.)
In C.T., the father had primary custody of his daughter under an Arkansas child custody order. While visiting her mother in California, the daughter disclosed that her father had sexually molested her. The California juvenile court assumed emergency jurisdiction over the child under the UCCJEA. At the jurisdictional hearing, the juvenile court found true the allegations of sexual abuse contained in the section 300 petition, placed the child with her mother, terminated its jurisdiction, and sent the case file to the Arkansas court. The father appealed. The appellate court held that the juvenile court was not authorized under the UCCJEA to make the jurisdictional finding because the finding had "permanent rather than temporary ramifications with regard to custody." (C.T., supra, 100 Cal.App.4th at p. 108.) The court emphasized that "Assumption of emergency jurisdiction does not confer upon the state exercising emergency jurisdiction the authority to make a permanent custody disposition. [Citation.]" (Ibid.)
*1564 At first glance, this holding appears to be based on the particular facts of this case, i.e., that the jurisdictional finding caused the father in Arkansas to lose primary custody to the mother in California, thus making a permanent custody change in contravention of an existing, out-of-state custody order. The court in C.T. stressed that the UCCJEA, and its predecessor, the Uniform Child Custody Jurisdiction Act (UCCJA) (Civ. Code, former § 5150 et seq.), were adopted to avoid "`relitigation of another state's custody decisions,'" discourage "`continuing conflict over custody'" and deter "`abductions and unilateral removals of children.'" (C.T., supra, 100 Cal.App.4th at p. 106.)
However, a closer reading reveals that the court in C.T. based its holding on (1) the statutory language in Family Code section 3424; (2) the court's recognition that Family Code, section 3424, subdivision (c), requires that any finding of emergency jurisdiction must be limited in duration; and (3) the nontemporary nature of a jurisdictional finding under section 300.
(9) The court in C.T. concluded that a jurisdictional finding under section 300 is a "condition precedent to a permanent custody disposition under the dependency scheme" and that the emergency jurisdiction under Family Code section 3424 "may be exercised to protect the child only on a temporary basis." (C.T., supra, 100 Cal.App.4th at p. 108.) The court further explained "In contrast to a section 300 finding, the order assuming emergency jurisdiction under the [UCCJEA] has time limitations. It must specify `a period that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction.' ([Fam. Code,] § 3424, subd. (c).) It `remains in effect until an order is obtained from the other state within the period specified or the period expires.' [Citation.] Because a true finding under section 300 has no time limitations, it is not the type of determination contemplated by [Family Code] section 3424." (Id. at pp. 108-109.)
The appellate court in C.T. distinguishes this approach from the solution previously set forth by a panel of the same court in In re Joseph D. (1993) 19 Cal.App.4th 678 [23 Cal.Rptr.2d 574] (Joseph D.). The Joseph D. court concluded that the juvenile court in that case should have contacted the other state's court after it had sustained the section 300 petition and made its jurisdictional finding, but before it proceeded with the dispositional hearing. (Joseph D. at p. 691.) The C.T. court distinguished Joseph D., correctly in our view, because "that case was decided under the old statutory scheme [the UCCJA], which did not contain the language in section 3424, subdivision (c) that the order finding emergency jurisdiction must be limited in duration." (C.T., supra, 100 Cal.App.4th at p. 109, fn. 4.)
(10) We believe the approach set forth in C.T. is the correct one under the UCCJEA for the same reasons explained in C.T. First, the statute upon which *1565 the Joseph D. court based its timeline for contacting the out-of-state court was part of the older statutory scheme, the UCCJA, which is no longer in effect and has been replaced by the UCCJEA. The UCCJA did not contain the language now found in Family Code section 3424, subdivisions (c) and (d), which emphasize the temporary nature of emergency jurisdiction and the immediacy of the California juvenile court's obligation to contact the out-ofstate court once it learns of the prior custody order or proceeding. Second, Family Code section 3424, subdivision (d) is very clear that, once a California court finds out that the court of another state has jurisdiction over a child custody matter, the California court must "immediately" communicate with the court of the other state. Typically, this information first comes to the attention of the California court at the detention hearing. That is when the California court should initiate contact with the court of the other state, unless of course it receives the information at a later point in the dependency process. Although in theory the jurisdiction hearing must be initially set for a date within 15 court days from the detention order (§ 334), in practice the jurisdiction hearing often takes place months after the detention hearing; thus we would disregard the very clear mandate of Family Code section 3424, subdivision (d), if we were to hold that our courts could routinely wait until after the jurisdiction hearing to communicate with the out-of-state court. Finally, a jurisdictional finding under section 300 is not temporary in nature, and authorizes the juvenile court to determine the proper disposition of the child, which can ultimately include guardianship or even adoption.
Here, the record shows that the juvenile court had at least some notice of the custody proceedings in Texas approximately three weeks after detention and nearly a month before the March 2, 2006, jurisdictional hearing. In the jurisdiction/disposition report filed with the juvenile court on February 6, 2006, the social worker reported that "Mother stated that she and father are going through family law court in Texas to determine custody." Thus, the juvenile court should have contacted the Texas court immediately or as soon as possible after being informed that custody proceedings were pending in Texas, but certainly before making the jurisdictional finding. This is because a jurisdictional finding under section 300 is much more permanent than the "temporary emergency jurisdiction" contemplated by Family Code section 3424.

5. Jurisdictional Error

DCS argues that, even if the juvenile court failed to follow the requirements of the UCCJEA, any error was harmless. This is because Mother would not have had her children returned to her, as is evidenced by Texas removing the children's half sibling, Mother's infant son, after the car accident in January 2007, placing the child in a nonrelative foster care home, denying Mother services, and preparing to have him adopted.
*1566 We agree as a practical matter that Mother would likely not have gotten Arriana and Aaron back had the California juvenile court communicated with the Texas court as required by the UCCJEA. However, this is an issue of subject matter jurisdiction, which for the same reasons it is not subject to waiver as discussed above, it is also not subject to harmless error analysis. "If jurisdictional error has occurred, the resulting judgment or order is `voidable and reversible on appeal even where ... it is clear from the record [that no prejudice resulted].' [Citations.]" (In re Marriage of Jackson (2006) 136 Cal.App.4th 980, 997 [39 Cal.Rptr.3d 365].)
(11) The juvenile court did not have jurisdiction under the UCCJEA when it entered jurisdictional and subsequent orders regarding Arriana and Aaron. Because subject matter jurisdiction was lacking at that point in this case, the juvenile court was without authority to act, and its orders, starting with the jurisdictional orders and including all orders entered thereafter, are subject to reversal.
B., C.[*]
......................................................................

III.

DISPOSITION
The jurisdiction order is affirmed with directions.[13] The juvenile court is directed to communicate with the 317th Judicial District Court of Jefferson County, Texas, in accordance with the UCCJEA. All orders beginning with the jurisdiction order are affirmed on the condition that the Texas court *1567 declines jurisdiction in favor of California. In the event that the Texas court chooses to retain jurisdiction, the jurisdiction order and all subsequent orders are reversed.
Hollenhorst, J., and King, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rule 8.1110(b), this opinion is certified for publication with the exception of II.B. and II.C.
[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] This third child was not a part of this juvenile dependency case and is not a subject of this appeal.
[3] Interstate Compact for the Placement of Children
[4] In an appeal from a judgment under section 366.26, we may not inquire into the merits of an earlier final appealable order from which appellate review was not sought. (In re Meranda P. (1997) 56 Cal.App.4th 1143, 1150-1151 [65 Cal.Rptr.2d 913].) This so-called "waiver rule" derives from section 395 making the dispositional order an appealable judgment and making each subsequent order, except the order setting a section 366.26 hearing, an appealable order after judgment. (In re Jesse W. (2001) 93 Cal.App.4th 349, 355 [113 Cal.Rptr.2d 184].) Section 395 provides, in relevant part, "A judgment in a proceeding under [s]ection 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment."
[5] "If there is no previous child custody determination that is entitled to be enforced under this part and a child custody proceeding has not been commenced in a court of a state having jurisdiction under [s]ections 3421 to 3423, inclusive, a child custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction under [s]ections 3421 to 3423, inclusive." (Fam. Code, § 3424, subd. (b).)
[6] "`Child custody determination' means a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child. The term includes a permanent, temporary, initial, and modification order. The term does not include an order relating to child support or other monetary obligation of an individual." (Fam. Code, § 3402, subd. (c).)
[7] "`Child custody proceeding' means a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue. The term includes a proceeding for dissolution of marriage, legal separation of the parties, neglect, abuse, dependency, guardianship, paternity, termination of parental rights, and protection from domestic violence, in which the issue may appear. [¶] The term does not include a proceeding involving juvenile delinquency, contractual emancipation, or enforcement under Chapter 3 (commencing with Section 3441)." (Fam. Code, § 3402, subd. (d).)
[8] The hearing was set for September 26, 2005. Hurricane Rita struck the area on September 24, 2005.
[9] A temporary emergency order must specify a period adequate for the person seeking relief, here the DCS, "to obtain an order from the state having jurisdiction"; the temporary order remains in effect only until an order is obtained from the other court or the specified period expires. (Fam. Code, § 3424, subd. (c).) "A court of this state which is exercising jurisdiction pursuant to [s]ections 3421 to 3423, inclusive, upon being informed that a child custody proceeding has been commenced in, or a child custody determination has been made by, a court of another state under a statute similar to this section shall immediately communicate with the court of that state to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order." (Fam. Code, § 3424, subd. (d).)
[*] See footnote, ante, page 1546.
[13] At oral argument, Mother's counsel brought to this court's attention two authorities from our Supreme Court, which she asserts should result in a straight reversal. Mother asserts that Griset v. Fair Political Practices Com. (2001) 25 Cal.4th 688 [107 Cal.Rptr.2d 149, 23 P.3d 43] and Varian Medical Systems, Inc. v. Delfino (2005) 35 Cal.4th 180 [25 Cal.Rptr.3d 298, 106 P.3d 958] both state that, where the trial court lacked subject matter jurisdiction over a matter, the judgment is void on its face and the reviewing court is limited to a straight reversal. However, as DCS pointed out, Varian simply held that an appeal from the denial of an anti-SLAPP (strategic lawsuit against public participation) motion stays the trial court proceedings, just as the appeal in this case stayed the adoption proceedings. The court in Griset similarly turned on a rather involved point of procedure that has nothing to do with the procedural issues in this case. Neither did either case mention C.T., Joseph D. or the UCCJEA, or otherwise give us any reason to reverse the juvenile court's orders without first allowing the juvenile court to communicate with the juvenile court in Texas to determine whether the Texas court desires to retain jurisdiction over these children.